Move to the third case this morning, Painter v. Illinois Department of Transportation. Thank you, Judge Caney, Richard Stegall, Judge Sykes, Judge Rover. I represent the plaintiff who was a long-time State of Illinois employee. She brought the action under a somewhat obscure provision of the Americans with Disabilities Act prohibiting inquiries or medical examinations on whether an individual has a disability unless it's shown to be job-related and required by business necessity. The, IDOT is the employer, as Illinois has waived its 11th Amendment immunity, but I also brought a Rehabilitation Act complaint, claim. Judge Mills in the, IDOT has the burden of proof of that. She was sent to five examinations in 13 months. Are her objections limited to the last two medical examinations, the ones conducted by Dr. Killian, or does she also seek damages for the three earlier ones? She was not damaged by the earlier ones, Judge, as you've perceptively asked a good question, because the labor grievance resolved it, transferred her from traffic safety to day labor, and said that nothing could be, no reference could be made again to those examinations or the conduct in traffic safety. So you're correct. What we're looking at are the December examination of Dr. Killian, the decision to send out, and then a later one in May where she was sent out. The, I took the deposition of Stuart Hunt, who was her supervisor. He did not know who made the decision, nor could he give the reasons for the decision. There was a 10-page complaint from the only person that worked under Painter and worked with her, Michelle Kelly. Hunt was not sure if he relied on that or not. The, while Kelly was allowed. Regardless of who did or who did not, there seems to be extensive evidence that her behaviors were causing serious disruptions in the work life of her coworkers. So, I mean, is it your contempt that disruptions to other workers cannot be used to justify a medical examination? No, but it also has to be related to the job. And her job was, when she went to day labor, is, these are the laborers we see on the highways. So in the summer, they're up to about 800. And Painter, with the assistance of Kelly, processed all the 800 applications, payroll, and did all that work for it. And then it went down in the winter to 30. There were about 10 other people doing other things in day labor. But look, I, you know, maybe she's technically fulfilling her own job duties. But it doesn't seem to me that she just fits any of the four facts. She seems to concede that many coworkers reported her to be alarming and that her behaviors were disruptive. And wouldn't that be sufficient to justify sending her for an exam unless there is some evidence that the complaints by the coworkers were a sham? Well, Your Honor, the evidence that's objective that's there is she didn't have interaction with them. It is that she was working out front, and they'd pass her going to the restroom or someplace else that she did not work with them. And that was the significant objective fact that was never considered. And that's what the basis of the appeal is, is that, yeah, the other workers were having complaints about her. Well, why are they over with the processing of these day labor applicants for the workers that come in every year? They had other things to do. How much interaction could there possibly be when she's sitting at a desk doing the processing of these applications with Michelle Kelly? That is the piece. But the complaints were a sham? I'm not saying they're a sham. I'm saying that given the limited exposure that if they're doing their job, they should have had very limited exposure to her. What I'm saying is that those complaints could not have been significant because there wasn't sufficient time to be exposed to her. And, of course, the other obvious response for a supervisor is, what are you talking about paying her for? You don't work with her. Stay away from her. And the other factor in this case that shows a significant violation is. She was screaming at people and sending bizarre e-mails. I mean, even her union representative was afraid of her, reported her to the Illinois State Police. Which they found nothing. And, of course, the union representative got removed for violation of his duties of representation for that. What it comes back to is her job function was to do these processing. And the burden is on the employer. And we never heard anything from Stout about exactly what the facts were. This came out of her. And some of those problems, Your Honor, were with traffic safety where she interacted with a lot of people. The actual problems she had with day labor were mainly limited to Michelle Kelly because that's only who she dealt with. And the other factor is that as soon as the, as far as I can tell, I don't know who made what decision based on what facts. And it's their burden to establish that. They tried to save it with an affidavit, but I still didn't know that. And then the other factor is the statute prohibits any inquiry or medical examination. Marie Malick Robinson testified that she, anytime she got any question about anybody, she sent it out to a doctor. Well, that's a statutory prohibited inquiry that the state of Illinois is violating regularly. The reason is understandable. She generally deals with employee assistance program, which is a cooperative, confidential thing. And so she's naturally being helpful. But that's an entirely different standard for what she's doing here. I've got a few minutes for rebuttal unless there's anything else. Thank you. Thank you. Ms. Buell. Good morning, your honors. May it please the court. Assistant Attorney General Caitlin Buell on behalf of the defendant, Appali, the Illinois Department of Transportation. Deanna Painter's behavior at the Department of Transportation inhibited the department's ability to serve the public and created an unsettling and unsafe work environment for its employees. Ms. Buell, who made the decisions to send her for the relevant medical exam? Was it one person? Was it a committee? Do we know? It is a collective process, your honor. Mostly the process for fitness for duty examinations at the Department of Transportation starts with gathering employee statements. And those statements go through the supervisors and then on to the fitness for duty coordinator, Ms. Malik Robinson. And then the fitness for duty coordinator provides a statement to a medical review officer at the Department of Transportation. And that individual is a medical doctor. They can determine next steps, such as whether a fitness for duty examination is necessary or if there's some sort of reasonable accommodation. And it was the medical officer here who orders the examination. But it was mostly a collective process among the supervisor and the rest of the fitness for duty team at the department. And what were the employee complaints after the transfer? We have a lot of complaints about bizarre behavior before the transfer, but as I understand it, we're focusing on the two examinations by Dr. Killian, which occurred after her transfer within the department. Absolutely. So I would first like to point out that Dr. Killian's first examination was actually based on a referral from her second fitness for duty examination when she was still in the traffic safety division. And so at that point, Painter was yelling at her coworkers. She yelled at one until she cried, and she was angry and ranting. She told one employee that her house was possessed, then yelled at her, threw her hands in the air, and came towards her. After she was transferred to the day... Ms. Buell, could you? I lost your lines. She told one employee that her house was possessed? Yes. On pages 1050... And then what did you say? So on pages 1057 and 1051 of the record, the employee was told that her house was possessed. Then Painter began to yell at her. She threw her hands up in the air, and she actually came towards her and was angry and ranting. And that employee was so scared that after the incident, she asked a guard to walk her out at night. Once Painter was transferred to the day labor division, an employee reported that Painter was continuously yelling in the office. That employee on page 1102 of the record said that she was fearful of retribution from Painter and that she had a, quote, gut feeling about Painter. That made that employee actually seek out other arrangements for her carpool to pick her up at night because she left work at the same time as Painter. Painter was also getting into altercations with her supervisor and yelling matches with her coworkers. In addition, she was engaging in workplace behavior that really inhibited the essential functions of her job as an office administrator in day labor. Painter was making a personal work log of every interaction she had with every single individual in the office. In the record, this spans over 40 single-spaced pages, and it outlines minute by minute her activities, her conversations, who did what. And she did this throughout 2011 and 2012. And her supervisor actually reported in his memoranda on page 1105 of the record that he was uncomfortable with this log because when he would ask her to do a task, she would respond, I'll let you know as soon as I check my notes in my log, or I'll do that as soon as I finish my notes. And so this sort of personal note-taking was actually interfering with her ability to get work done, including her actual work. And her supervisor said that they had deadlines coming up for paper and personnel work that were being inhibited by Ms. Painter's behaviors. In addition, Ms. Painter was also sending emails nonsensically to her supervisor in the middle of the night. Her supervisor reported that he would get emails from her from 10 p.m. to 5 a.m. that would cause his BlackBerry to ping in the middle of the night when he was asleep. They were often nonsensical. And her supervisor had to actually take time out of his schedule to deal with Painter's behavior. He had to create personnel issues memorandum about her behavior on a day-to-day basis, interview other coworkers about their interactions with Painter. And the record is replete with logs from her supervisor about her behavior, her changing moods, and her aggressiveness towards her supervisor and other employees. Thus, the department's request for a fitness for duty examination was job-related, as Painter's behaviors were actually interfering with her work. Turning back to the business necessity point, the fitness for duty examinations were supported by a business necessity as well. I'd first like to note that in this circuit, an employer just needs to provide objective evidence that an employee's behavior would cause a reasonable person to ask if they could perform the essential functions of their job under the business necessity standard. And the 11th Circuit case of Williams v. Motorola is very instructive here. It notes that an employee's ability to handle reasonably necessary workplace stress as well as work reasonably well with others are essential functions of any position, and that a concern for the safety of fellow employees or the public at large can also constitute a business necessity. And here, Painter wasn't able to work reasonably well with others or handle workplace stress. As we've discussed, she was yelling at her fellow coworkers. The coworker who had a cubicle adjacent to her in the traffic safety division noted that Painter appeared to be extremely paranoid and exhibited compulsive behavior habits, and she would try to avoid Painter's arguments and would come in after the staff had arrived for safety in numbers. What is your best evidence that she presented a danger to her coworkers? Because I understand that her behavior was disruptive to others, but to what extent or degree must an employee be disruptive of a behavioral health exam may be order? Well, here the best evidence is most certainly the sheer number of employees who were fearful of Painter, who didn't want to be around Painter because they scared her, and then also the business necessity standard says that the department does not need to wait for a threat to actually materialize before they move to protect the safety of fellow employees or Painter's union representative. And here, the union representative who knew Painter best, who was on her side, actually perceived her email to him in which she said that something was dead around here, all right, was an actual threat and required an investigation. And that most certainly was serious enough to warrant the fitness for duty examination, though the fact that employees were fearful of Painter, arranged for escorts out of the office, and were unsettled and uncomfortable. Is it true that the union representative was fired because of sending this request to the Illinois State Police? Your Honor, I'm not sure about that. That wasn't reflected in the record. The only thing that the department was concerned about was the fact that the email was sent, that the union representative was fearful, and that the Illinois State Police had to actually investigate the matter. In addition, the department had all of the employee statements that they were fearful of Painter, needed different arrangements out of the office so that they would not have to be alone with her. Yes, but was he fired? You say the record doesn't reflect whether he was fired? Correct. Not to my knowledge. I would also like to take an opportunity to discuss the mischaracterization of Kroll. The Kroll standard that counsel was referring to was that an employer did not need to identify the exact person who ordered the examination to be a business necessity. But actually, the Kroll holding is consistent with Kauffman, and an employer just needs to produce objective evidence that a medical examination is both job-related and consistent with the business necessity. So there needs to be a reasonable belief that the employee cannot perform the job, or that the employee threatens the safety of other employees. And here, the department met that standard. Because Painter's behavior inhibited the department's ability to do its work, the department's decision, and created an unsettling work environment for employees, the department's decision was both job-related and consistent with the business necessity. So the department requests that you affirm the district court's judgment. Thank you. Thank you, counsel. Thank you. The problem with the reference to the many employees, it goes back to traffic safety, which was resolved by the union grievance with the IDOT agreeing that any and all negative information regarding the fit-for-duty examination will be expunged from her personal record. The only reason I brought that up was to show the inability of IDOT to take no for an answer. Because each of those three exams came up, no mental health, and then Dr. Killian's came up with no mental health. The record does not show, I don't know whether the union representative, Judge Rovner, was fired per se. The union representative was removed from Painter's case, and someone else took it over and successfully resolved her union grievance. That's very different from what you said in your opening argument. I'm sorry if I overstated it. Basically, to me, it was he was removed. I don't know. I didn't follow up the union politics of what happened after he was removed. Thank you, counsel. Thank you. Thanks to both counsel. The case is taken under advisement.